UNITED STATES DISTRIC AND BANKRUPTCYCOURTS
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LUIS DE SOUSA<br>500 BRAEBURN DRIVE<br>WINCHESTER, VA 22601<br>Cell # 703 399 4421<br><br>Plaintiff,<br><br>VS.<br><br>THE EMBASSY OF THE REPUBLIC<br>OF ANGOLA<br>2108 16TH St NW<br>WASHINGTON, DC 20009<br><br>Defendant. | Case: 1:16-cv-00367<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 2/25/2016<br>Description: Pro Se Gen. Civil<br><br>**COMPLAINT** |

## INTRODUCTION

Plaintiff, Mr. Luis De Sousa (" Luis De Sousa"), bring this civil action against Defendant, the Embassy of the Republic of Angola ("Angola embassy") under the 28 U.S. Code § 1605 – (a)(2),(3) & (5).

The Angolan Embassy, through its diplomatic staffs and some of local employees, engaged in pattern or practice of misconduct. Theft by deceptions, mockery, death threats, threats, defamation, and careless behavior that has resulted in monetary loss, immense distress and other consequences that will affect Mr. Luis De Sousa's life and business for years to come. Mr. Luis De Sousa brings this action to remedy defendant's unlawful conduct and to secure the declaratory and injunctive relief needed.



1

Mr. Luis De Sousa alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S. Code § 1605

2. Under 28 U.S. Code § 1605. (a)(2), (3) & (5)

## PARTIES

3. Plaintiff is Mr. Luis De Sousa.

4. Defendant the Embassy of Republic of Angola.

## FACTUAL BACKGROUND

5. Defendant is defined as a foreign State at 28 U.S.C. § 1603(a), (b).

The Ambassador of the Embassy of the Republic of Angola is Mr. Agostinho Tavares. Mrs. Sandra Guerreiro is the head of administrative department and the Ambassador's second daughter. Mrs. Claudia is the Secretary of the Ambassador and is the Ambassador's first daughter. Mr. Nito Nobel is local recruitment employee of the embassy and is the Ambassador's son-in-law by marriage to Mrs. Claudia. Mr. Miguel is another local recruitment and part of administration staff.

A                 **FACTUAL ALLEGATIONS**

6. On the July 2015, I got a call from Mrs. Guerreiro, administrator of The Angola Embassy in

Washington D.C, saying that I needed to be at the embassy the next morning at the request of the Ambassador himself Mr. Agostinho Tavares, she told me that she did not know exactly the circumstances of why I was called to be there. The following day, I picked up Mrs. Guerreiro and we went to the embassy. Upon arriving, Ambassador Agostinho Tavares was extremely upset with the local employees and started to show us all the defects of the embassy's building: the celling, the walls, the A.C. units, the front of the building. The ambassador told me ("Luis De Sousa") that many of the local employees thought the previous company they had employed was swindling money from the embassy. The Ambassador showed a parking lot that was done by the previous company, that the embassy had spent $800,000.00 but the work done wasn't justified the money paid by the embassy, according to Ambassador Agostinho Tavares. He then stated that from now on he would compare prices himself because he no longer trusted local employees and the previously employed company. The Ambassador also asked me to find a construction company by next morning, I searched online and found a company, J & C Builders Inc., after several hours of researching.

7. The next morning I introduced the J & C Builders staff to Ambassador Agostinho Tavares and after a meeting with The Ambassador, he explained to them what kind services he wanted from J & C Builders Inc. Their managers asked Ambassador Tavares which employees at the embassy they should give the estimates and contract to. Mr. Miguel, an employ from the administrative department, told them that they should give him the paperwork. The ambassador, however, did not agree with Mr. Miguel and told the company that any paperwork should be given to me, which surprised me due to the fact that I was in no way employed with the embassy. In efforts to make the situation less complicated, I told the Ambassador that as soon I get this proposal I would give it to Mrs. Guerreiro, but my suggestion was automatically dismissed by Ambassador Tavares who replied to my suggestion by stating no one was suppose to know the amount or see the paperwork.

3

In private, the Ambassador told me that he would be traveling and that I needed to make sure that no one at the embassy talked to the construction company employees about the contract or the amount on it since we were doing investigations on the local employees. I ("Luis De Sousa") was told that, when I get the proposal or contract from J & C Builders, I ("Luis De Sousa") should add another $14,00.00 dollars as my commission.

B      **CONFUSION BETWEEN MR. MIGUEL AND THE AMBASSADOR**

8. Ambassador Tavares began to show Mr. Miguel and the J & C staff throughout the embassy while stating what changes he wanted to the building, inside and out. For instance, when we reached the front of the building, the ambassador requested to have the entire stairway replaced with new marble and the amount of marble increased. When the Ambassador had gone inside Mr. Miguel told the J & C Builders staff to disregard Ambassador Tavares's request because it was a "historic building" and all they ("J & C Builders. Inc. staff") could do was clean the old marble that was already there. The next day, J & C Builder's staff met with me ("Luis De Sousa") at the embassy because they wanted to make the measurements, I requested to be accompanied by one of the embassy's employees, who ended up being Mr. Miguel, and he began to guide the J & C staff to the places where the ambassador had asked J & C Builders to repair. The same day, Mr. Miguel started to make more changes to the ambassador requests; where the ambassador asked to change carpet to ceramic while Mr. Miguel asked to replace the carpet with new carpet in order to save money for the embassy, where the ambassador requested division by a wall another embassy staff member requested to instead put a large window, and so on. A few days later, J & C Builders presented me with the contract and price to me ("Luis De Sousa") since none of the staff at the embassy was supposed to view or know about the documents.

4

C. **WHILE THE AMBASSADOR WAS OVERSEAS.**

9. While Ambassador Tavares was overseas, he talked to me and asked about the price of the contract. After I ("Luis De Sousa") told the Ambassador that it was $ 79,000.00, the ambassador asked me to go see Mr. Nordine, the financier of the embassy, to get the check to give to J & C Builders. Inc. After Mr. Nordine confirmed by phone with the Ambassador the next day, Mr. Nordine told me that the ambassador given him (Mr. Nordine) authorization to pay only half the money. Mr. Nordine wrote a check in name of J & C Builders that I then gave to J & C Builders. Inc. the same day and J & C Builders then gave me (" Luis De Sousa") my "commission" of $14,000.00.

D **THE AMBASSADOR RETUNS TO THE USA**

10. Ambassador Tavares called me his first working day after returning from his trip, we spoke about some issues that I had had with the people from the State Security of the embassy. He asked me about the construction paperwork, and upon revision of the paper work, he asked me to go the J & C Builders and ask them to increase the price from the original $79,000.00 (now) to $98,943.32 to eliminate the scope of work and the estimate pages from the contract. I was surprised and confused and told him that I was content with the original commission that he had already given to me. He insisted that everything was fine and "he knew what he was doing," and not to worry about it, so I went J & C Builders with the request.

11. The same week, J & C Builders asked to talk to the embassy since they (J & C Builders, Inc.) were working for more than a month without any signed contract from the embassy and also requested another $25,000.00 to keep up the construction or they (J & C Builders, Inc.) would stop any further construction. I ("Luis De Sousa") went to the embassy to talk to Mr. Nordine, but was unable to because he was on vacation. Some time afterwards, Mr. Nordine and I ("Luis De Sousa") spoke on the phone and we agreed that I ("Luis de Sousa") will give J & C Builders the money and the embassy would

pay me back upon him retuning from vacation. I ("Luis De sousa") sent J & C Builders a check from my business, Luenda Group. Inc, of only $14,000.00 in order to keep the J & C builder workers working on the embassy while Mr. Nordine was on vacation.

12. Upon Mr. Nordine retuning from vacation, I ("Luis De Sousa") went to see him and asked him for my check, Mr. Nordine gave me back a check of $33,943 of J & C Builders. Inc. I tried explained to him that this type of transaction can get complicated to report to the IRS at the end of the year, but it made no difference. I ("Luis De Sousa") went talk to J & C Builders and explained the situation to them so they could give me back a check in name of my business, Luenda Group, Inc., in the amount of $33,943.32. J & C Builders give me a check in the amount of $30,000.00 because they charged me a 10% fee for that strange and complicated transaction.

13. Frustrated with the situation of this transaction, I ("Luis De Sousa") called Mrs. Guerriero to explain the situation. Mrs. Guerriero replied that, "Mr. Nordine was nobody at the embassy he was only a regular employee and their (herself and Ambassador Tavares) objective was to break the will of those dogs (the embassy employees) in order to make them do whatever they (Mr. Sandra and her father the ambassador) want." After stating this, she changed the subject.

14. A few days later, Ambassador Tavares told me to start the investigation and repairing the air conditioning units of the building and I ("Luis de Sousa") told him that for this project Luenda Group. Inc, could do the work and bill the embassy and Ambassador Tavares agreed.

15. A few weeks later, Ambassador Tavares told me that I should return the money that he gave me as commission so that he could return it to the embassy because he did not want the employees at the embassy to think that he doing something unethical. I was unscathed by this request because I never asked the Ambassador for anything, let alone the commission he gave me. Because I am in the truck industry I had some money at home that I gave to him and I asked him to wait for the rest until it cleared from the bank. I went to Ambassador Tavares and gave him a check of $19,943.32, which he refused because of the type of payment that it was. He then attempted to guilt me with our friendship, professing trust he felt toward me and then accusing me of not wanting to give the money back to the embassy.

6

When I told him that I would bring the money next day he told me that I should not bring it all; that I should bring it in small quantities. I told him that after he gets all the money, I would stop coming to the embassy.

16. After I had finished the job with the air conditioning units, The Ambassador attempted to make me overcharge the embassy in my invoice an extra $10,000.00. When I told the ambassador that I would give him the money back in check and not in cash, because I (Luis De Sousa) had to report all my transitions to the IRS, The Ambassador change his mind.

17. After a few weeks of avoiding the embassy, the embassy staff called me, so I went to the embassy and I ("Luis De sousa") explained to Ambassador Tavares that J & C Builders wanted more money to do the changes that Mrs. Guerriero requested. Since J & C Builders. Inc, did the work according to Mr. Miguel requests and Mrs. Guerriero did not agree with Mr. Miguel's(Mrs. Guerriero wanted marble in front of the building and to replace the carpet and wood floor with ceramic and so on) order that was in the original contract with the J & C Builders. Inc. The Ambassador told me ("Luis De Sousa") that the contract with J & C Builders was already too high and was almost the same price of the other proposal that Mr. Miguel and Mr. Celestino had given to him prior. Ambassador Tavares asked me to take responsibility for all the mistakes that had occurred with this project because he (Ambassador Tavares) didn't want to look bad. I refused and advised the Ambassador to request a meeting with J & C Builders to which the Ambassador refused and called for a surprise meeting with the administrative employees, present at this meeting were: Mr. Nordine (the embassy financer), Mr. Miguel (administration staff), Mrs. Guerriero (head of administration) and Mr. Celestino (administration staff). During the meeting, they stated wanting review the work that was already done by J & C Builders when the Mrs. Guerriero started to complain about the project and started to blame me for everything that was wrong since I ("Luis De Sousa") was the person that introduced the J & C Builders to the embassy. I explained to her that Mr. Miguel had changed almost the entire initial order that the Ambassador had originally given to J & C Builders. Inc. Even after Ambassador Tavares recognized that Mr. Miguel changed his orders, he didn't have any reaction about Mr. Miguel undermining him. Ambassador Tavares only asked the administrative

7

employees to give a new contract for maintenance and property management to my company Luenda Group. Inc, to do the work that the J & C Builders didn't do and to accommodated Mrs. Guerreiro's wishes.

**E**                         **THE FIRST CONTRACT**

18. Two days later, I gave the contract to Mrs. Guerreiro to sign and began working and hiring while paying construction and A.C. companies to do the job. While this was occurring, I was asking Mrs. Guerreiro about the contract since the job was going by very fast but she kept procrastinating and stalling every time I asked. At one point, she told me that it would be signed after her daughter's birthday party, which my wife was supposed to decorate. Even when the job was practically done at the embassy, she told me she would not sign any more because she would rather work with the company that the embassy had previously worked with before her father started working there. This confused me ("Luis de Sousa") because the reason that I was called to the embassy was because of the poor performance and the corruption between the previously employed company and the local employees, namely Mr. Miguel, Mr. Celestino, Mr. Marthan and Mr. Angelo, that were stealing from the embassy.

19. By this time, I had only $1,700.00 in my account and they were deliberately wasting my time, money and efforts. After requesting in supplication and trying to make them understand that I needed to get paid because I ("Luis De Sousa") had to pay the companies that I had contracted, Mrs. Guerriero stated that she no longer cared because, "it was no longer her problem," and she began to blame me ("Luis De sousa") for the money that was missing and accusing me of stealing it. Mrs. Guerriero told me if I want to get paid my money and the contract signed, I ("Luis De Sousa") had to have a contract release from J&C Builders; and that I was at fault because I was the person who introduced J&C Builders to the embassy.

Under extreme financial pressure and threats coming from Ambassador Tavares, I decided to talk to J&C Builders to give the contract release to me. J&C Builders agreed only on the condition that I pay J&C

8

Builders the amount of $26,000.00 for the release. After I ("Luis De Sousa") begged J&C Builders management to understand, they agreed to give me the release for the amount of $1,500.00.

20.     A few days later, I experienced an unexpected, unlawful interrogation by Mrs. Guerreiro and Mr. Nordine, where I was verbally abused, bullied, threatened and accused. The following week, I decided to speak with Ambassador Tavares see if he could stop the abuse, but he told me that he no longer was involved since the embassy already had the contract release from J & C Builder, to me ("Luis De Sousa") and that was all the proof that the embassy was needed. He said that if I had lost my money that I should talk to J & C Builders to be compensated because the embassy already had the proof they wanted and he that no longer needed the 75% of my contract that he had requested from me. Ambassador Tavares also told me that the money that I retuned to him, he already had spent. I went and talked to his son-in-law that also worked at the embassy, Mr. Nito Nobel, and he told me that this situation was one that I had to accept and there was nothing that I could do to get the money that I lost working for the embassy. I ("Luis De Sousa") left the embassy in emotional duress. When I ("Luis De Sousa") got outside of the embassy, I met with Mr. Vladimir, a consulate staff and Ambassador Tavares's youngest son, who asked me ("Luis De Sousa") why I was crying and so upset. After explaining to Mr. Vladimir what his father and his sister, Ambassador Tavares and Mrs. Guerreiro did to me; Mr. Vladimir told me that he would speak to them. The same night, Mr. Vladimir sent me a text message "apologizing for what his family had done to me." After consulting with my lawyer, I ("Luis De Sousa") decide to bill the embassy with invoice # EMB 101 A for the amount of $149,169.77 for the entire job that I had done for the embassy. I got a phone call from Mr. Nito Nobel and I told him that I had evidence of what they were doing to me, ("Luis De Sousa") even audio recordings and I would take legal action against the embassy to recuperate my money. After that, I blocked all the phone numbers from them to avoid any contact with them because I ("Luis De Sousa") was dealing with severe symptoms of depression. After a few days, Mr. Angelo contacted me saying that Ambassador Tavares was looking for me and requesting me to do a contract even bigger then the first.

F                          **THE SECOND CONTRACT**

21. After speaking to the Ambassador Agostinho Tavares on the phone I went to the embassy; where he confirmed what Mr. Angelo had just told me. Ambassador Agostinho Tavares began to apologize for what they had done to me and assured me that it would not happen again. Ambassador Agostinho Tavares stated "since I was like a son to him," he would give me the newer, bigger contract in order to recuperate my money. A few weeks later he gave Mrs. Guerreiro the new contract to review and sign. After a few unexpected meetings with employees from administration he told them that after January 2016 I would start working at the embassy to slowly recuperate my money back.
After a meeting with the ambassador on January 11, 2016, I went to the house of his secretary and oldest daughter, Ms. Claudia, by invitation of her husband, Mr. Nito Nobel, who was concerned about Ambassador Tavares's illegal actions to try to explain to her what Ambassador Tavares was doing; not only the situation with me but about some other cases, where the ambassador brought someone from Angola to work in the United States work in the US illegally. Mrs. Claudia began to threaten me. Once it became apparent that I was intimidated, they began to ask me how would they and everybody at the embassy get paid if Mrs. Guerreiro signed the contract, talked about how that I would need to give 10% to Mrs. Guerreiro, and how I would have to pay her dad and the other embassy employees. After explaining to them that I could do whatever they wanted as long as it is legal, they told me not to worry and that they would talk to Mrs. Guerriero and the contract would be signed. Mrs. Cluadia then stated that the reason the initial contract was never signed was because Mrs. Guerreiro was jealous about the amount of money I would make. Another condition to get the contract was for me to apologize to Mrs. Guerriero and her husband, Edson Guerriero, to make them "feel better and more superior" than me. Another condition to remedy any jealousies and get the contract signed was for me to apologize to Mrs. Guerreiro and her husband.

# G     VERBAL AND PHYSICAL ATTACK TOWARDS MY WIFE AND THE REASON THAT MRS. GUERRIERO DECIDED NOT TO SIGN THE FIRST CONTRACT AND NOT PAY ME FOR MY SERVICES

22. The reason I had to apologize to Mrs. Guerreiro and Mr. Edson Guerreiro, her husband, was because of an incident that had happened on September 26th, 2015, at Ambassador Tavares's house. My wife, Marcia De Sousa, had been decorating for two days for Mrs. Guerreiro's daughter 16th birthday party. Suddenly, Mr. Guerreiro pushed and verbally attacked my wife and making death threats toward me because he had called me twice and I hadn't answered my phone; all while my wife had our one-month newborn in her arms. My wife, Marcia De Sousa, was already tired from the two days of working and taking care of our newborn and this assault was too much for her and the baby, so my wife decided to leave the house. My wife and child were still distressed by the assault by Mr. Guerreiro later that evening, despite hours of being home and attempts made by our two older children and I to comfort Marcia and the baby.

Several hours after the incident, I received a call from Mr. Nito Nobel he began to state that I should not expect to have the contract signed. He further explained that it did not matter if Mr. Guerreiro had been attacking and berating my wife; it was not appropriate for my wife to leave the Ambassador Tavares's residence. I tried to explain to Mr. Nobel that the two events had no correlation but he insisted on what he had previously stated. I was ("Luis De sousa") still trying to understand why Mr. Guerreiro had been so cruel towards my wife, especially after just had given birth to our baby and working for more than 48 hours with little rest and without pay, but was still expected to apologize for my wife attempting to take our newborn and herself from a hostile environment or lose all the money that I had tied at the embassy. Ever since that day, things became increasingly hostile. I was constantly blamed or accused of things that I had not done, or was faced with constant defamation, humiliation and threats.

23.     During my time at the embassy, they tried to force me to accept responsibilities that had nothing to do with me, threatened numerous times not to speak about this case, and threatened me for something as trivial as not answering my phone.

### G        DEFENDANT HAS A PRIOR INVOICE FROM 2013 THAT NEVER PAYED

24.     On October of 2013, I ("Luis De Sousa") got a call from Mr. Lima, a diplomat from the Embassy of Angola, asking if we could offer our party services at a event at the embassy. After I said that we could, Mr. Lima then explained that we have to send a preform invoice to Ms. Maria de Fatima, a diplomat at the Angolan Embassy, because she was comparing price with all the businesses that they (the embassy) had contacted. Three days later, my wife got a call from Mr. Lima and Ms. Maria De Fatima informing her that our business was approved because our ("Luis De Sousa and Marcia De Sousa"), business had the "best price," as Ms. De Fatima stated and that my wife and I ("Luis De Sousa and Marcia De Sousa") should send someone to the embassy for a meeting and see what service they would like to have.

25.     On November 5th, my wife went to meet with Ms. Maria De Fatima who explained the details of the events to my wife and made very specific order of plates, fabrics with specific colors, appetizers, flowers and dishware. My wife (Marcia De sousa) informed Ms. Fatima that because this was these were very specific requests and Marcia (my wife) would have to order all the materials for the event because she did not already have them. Ms. Fatima agreed and went to show my wife the place where the event would take place. When my wife was about to leave Mr. Fatima asked my wife if she could reduce the price from the original $4,481.02 price. My wife explained to Ms. Fatima that the original price was specific for this event since she wouldn't be making any profit off this event. But because Marcia had given her word to Mr. Lima that she (Marcia De Sousa) would do this event for the embassy, she (Marcia De Sousa) agreed, as a courtesy, to give Ms. Fatima the new price of $3,500.00. After Ms. Fatima had agreed on the price, my wife left the embassy.

26. Less the 18 hours before the event, while my wife was working hard to make sure that everything that the embassy had requested was in order, checking all the orders that she had done for this event were in place and loading the truck to make everything ready for the next day's event at the embassy, my wife and I got a call from Ms. Fatima saying that Marcia needed to change the price because she was only approved $3,000.00 for this event. My wife tried to explain to Ms. Fatima that we ("Luis De Sousa and my wife") had spent more than the $4,637.40 on just the order that Ms. Fatima had requested. At the end of the day we sent a new invoice with the new price of $3,000.00.

27. When my wife, four employees and one of my truck drivers were driving to the embassy, my wife called Ms. Fatima to inform Ms. Fatima that Marcia (my wife) and her team would be arriving in less than hour. Ms. Fatima answered the phone and told my wife that she had to cancel her request because she had found a better deal. My wife explained to Ms. Fatima the penalty since the cancelation was less 24 hours before the event at the embassy was that we ("Luis De sousa and my wife") would send a new invoice to the Angolan embassy that had the initial price of $4,637.40, a 20% restock fee, a $95.00/hr charge of the work already done, and 30% of the grand total of invoice. Ms. Fatima said that she had nothing to worry and hung up the phone while my wife was still speaking to her.

28. November 10, 2013, I ("Luis De Sousa") sent an email explaining the same ramifications for cancelling the event 24 hours before the event, that Marcia had already previously explained, to Mr. Lima and Ms. Fatima. Several days later, I ("Luis De Sousa") sent a new invoice to the Angola embassy in the amount of $11,556.84 that we ("Luis De Sousa and my wife") have yet to receive a payment for.

**FIRST CLAIM FOR RELIEF:**

**DEFENDANTE'S DIPLOMATS OR EMPLOEES ACTIVITIES VIOLATE**

**28 U.S. Code § 1605 (a)(2), (3) & (5).**

29.     Luis De Sousa realleges and incorporates by reference the allegation set forth above.

30.     Luis De Sousa is authorized under 28 U.S. Code § 1605. (a)(5) to seek declatory and equitable relief to eliminate a pattern or practice of the Angola Embassy in the United State of America, a conduct that has caused immense emotional distress, finance lost ,defamation and property lost.

31.     Defendant, it agents, employees or persons acting on its behalf have intentionally deceive and plotted against Mr. Luis De Sousa, in order to cause emotional distress, financial and property loss.

32.     Defendant, it diplomats, employees or persons acting on its behalf have intentionally committed theft by deceiving against Mr. Luis De Sousa, that caused lost of property and finance lost, and emotional distress, defamation.

33.     Defendant, it diplomats, employees or persons acting on it behalf have intentionally engaged in defamation, bullying, and humiliation against Mr. Luis De Sousa, that caused immense emotional damages and emotional distress.

34.     Defendant, it diplomats, employees or persons acting on it behalf have engaged intentionally in dead treats against Mr. Luis De Sousa, that caused extensive emotional distress, to the point that Mr. Luis De Sousa, is scared to return to Angola where he was was born and visit family and friends that he hasn't seen for nearly 20 years.

35.     Defendant, it diplomats, employees or persons acting on it behalf have engaged in inappropriate and unethical business practice against Mr. Luis De Sousa, to the point of causing extensive emotional distress, finance and property lost.

36.     Defendant, it diplomats, employees or persons acting on it behalf have break a verbal contract.

37. By the actions set forth above, Defendant has engaged and continues to engage in a pattern or practice of conduct by it diplomats, employees or persons acting on it behalf that is causing Mr. Luis De Sousa, emotional distress, financial loss and property loss in total violation of the 28 U.S. Code § 1605 – (a) (2), (3)

## SECOND CLAIM FOR RELIEF:
## DEFENDANT'S ACTIONS THROUGH HIS EMPLOYEES CAUSE DAMANGES

38. Luis De Sousa re-alleges and incorporates by reference the allegation set above forth above.

39. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa to close two internet businesses; one in the United States of America, a search engine Roadbreackdown.com, and the other in Portugal, Europe Roadbreackdown.pt.

40. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa to layoff two employees; one in the United States of America, Ms. Samantha Halt, and other in Europe Portugal, Mr. Marco Rodrigues.

41. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa to lose a truck company.

42. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa's home to be in foreclosure.

43. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa, to apply for bankrupt.

44. Defendant has engaged in practice or conducts that caused Mr. Luis De Sousa, lost of revenue in the amount of $ 260,000.00 or more for the year of 2015.

45. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa to pawn his family car.

46. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa extreme emotional distress, financial loss and property loss.

47. Defendant has engaged in practice or conduct that led to Mr. Luis De Sousa to have health complications due to the emotional stress.

48. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa to fearful of returning to Angola, the country where he was born to visit family and friends that he hasn't seen for almost 20 years.

49. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa a loss of business investment in the amount of $275,000.00.

50. Defendant has engaged in practice or conduct that caused Mr. Luis De Sousa to give up an airplane ticket that he had bought last year to go to Angola, due to death treats made by the defendant through his diplomats, employees or persons acting in its behalf.

51. Defendant still possess invoice # 331 A since November 15, 2013, in the amount of $11,556.84 that was never paid.

52. Defendant has invoice # EMB 101A in amount of $149,169.77 that the defendant has had in their possession since October 29, 2015, that was never paid.

53. Mr. Luis De Sousa is requesting a trial by a jury.

**PRAYER FOR RELIEF**

54. WHEREFORE, Mr. Luis De Sousa, prays that the Court:

55. Declare that the defendant has engaged in a pattern or practice and conduct of seriously Irresponsible behavior through it diplomats, employees or persons acting on it behalf that have caused Mr. Luis De Sousa health problems, immense distress, property and finance lost defamation in violation of the law of the United States, 28 U.S. Code § 1605.(a)(2),(3).

56. Order the Defendant, to pay in full the invoices # EMB 101A and # 331 A plus 12 % interest for each month that the invoice has been in the Defendant's possession without pay.

57. Order the Defendant, to pay the relief in the amount of $360,000,000.00 to Mr. Luis De Sousa.

58. Order such other appropriate relief as the interests of justice may require.

Respectfully submitted this 25th day of February, 2016

LUIS DE SOUSA

500 BRAEBURN DRIVE

WINCHESTER, VIRGINIA 22601

(703) 399 4421